[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12457
_____

D.C. Docket No. 9:16-cv-80170-KAM


HARBOURSIDE PLACE, LLC,
a Florida limited liability company,

Plaintiff - Appellant,

versus

TOWN OF JUPITER, FLORIDA,
a Florida municipal corporation,
JUPITER COMMUNITY REDEVELOPMENT AGENCY,
a dependent special district of the Town of Jupiter, Florida,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 14, 2020)

Before JORDAN and JILL PRYOR, Circuit Judges, and COOGLER,[*] District Judge.

JORDAN, Circuit Judge:

Harbourside Place, LLC—whom we'll call Harbourside—is the owner of Harbourside Place, an 11-acre commercial development located in Jupiter, Florida, along the Intercoastal Waterway. Harbourside Place is a mix of retail, hotel, and office space that encompasses some open public spaces, including a riverwalk and an outdoor amphitheater. Water's Edge Estates, a residential development, is located across from Harbourside Place on the Intercoastal Waterway.

Not happy with the fact that provisions of the Jupiter Code were applied to prevent Harbourside Place from holding live musical performances, Harbourside sued Jupiter and its Community Redevelopment Agency under 42 U.S.C. § 1983. After Harbourside filed suit, Jupiter enacted Ordinance 1-16 to deal with, among other things, the regulation of amplified sound. Harbourside moved for a pre-enforcement preliminary injunction, alleging in part that certain sections of Ordinance 1-16 are content-based regulations of speech that violate the First and Fourteenth Amendments. Harbourside also claimed that, contrary to Jupiter's administrative findings, it satisfied the criteria to be considered a certified outdoor

---

[*] The Honorable L. Scott Coogler, Chief Judge of the United States District for the Northern District of Alabama, sitting by designation.

venue (which, among other things, would have allowed it to hold live musical performances under the Jupiter Code).

The district court, following an evidentiary hearing, denied injunctive relief. The district court found, as a factual matter, that Harbourside has not met the criteria to be an outdoor venue. It also concluded that the challenged sections of Ordinance 1-16 are content-neutral and do not violate the First Amendment. Harbourside appealed the district court's order.

We affirm. Conducting limited abuse of discretion review—and without definitively addressing the merits—we conclude that the district court did not abuse its discretion in ruling that Harbourside failed to establish a likelihood of success on its claims that it qualifies as an outdoor venue and that the challenged sections of the Jupiter Code are content-based.[1]

**I**

As relevant here, Ordinance 1-16 establishes a two-tiered scheme for the use of amplified sound at non-residential properties and contains a separate section relating to outdoor live musical performances. We summarize these provisions below, and for ease of reference we cite to Ordinance 1-16 as it is currently codified

---

[1] We address only the issues that Harbourside has raised on appeal and do not pass on any other matters that might be presented by Harbourside's complaint or that were addressed by the district court. For example, Harbourside has not based its First Amendment challenges on *Reeves v. McConn*, 631 F.2d 377, 384–86 (5th Cir. 1980) (reviewing, and holding unconstitutional, portions of a city ordinance regulating the operation of sound amplification equipment). As to any issues not specifically discussed in this opinion, we summarily affirm.

in the Jupiter Code.

The Code restricts the use of outdoor sound amplification devices—in all circumstances—between the hours of 11:00 p.m. and 7:00 a.m.  It is "unlawful to use, operate or permit to be played . . . any outdoor sound amplification machine or device . . . for the production or reproducing of sound between the hours of 11:00 p.m. and 7:00 a.m., except if approved as an outdoor venue[.]"  Jupiter Code § 13-107(a)(1); D.E. 173 at 4.

A venue "may be approved to operate outdoor sound amplification devices with extended hours up to 12:00 a.m." (i.e., for an extra hour) if it meets the criteria for an outdoor venue and complies with applicable "[e]xterior sound standards."  Jupiter Code § 13-107(b)(1)-(6); D.E. 173 at 4.  These sound standards can be found at § 13-144, Table 2, of the Code.  Measured at a three-minute equivalent sound level (or Leq), the current sound standards for outdoor venues that are commercial/mixed use properties without residential components are 65 dBA between 7:00 a.m. and 11:00 p.m.; 55 dBA between 11:00 p.m. and 12:00 a.m.; and 50 dBA between 12:00 a.m. and 7:00 a.m.  The standards were lower in 2015 and 2016.[2]

---

[2] The abbreviation dBA stands for A-weighted or adjusted decibels.  An adjusted decibel is a "unit used to show the relationship between the interfering effect of a noise frequency, or band of noise frequencies, and a reference noise power level of—85 dBm." McGraw Hill Dictionary of Scientific and Technical Terms 39 (6th ed. 2003).

Notwithstanding the restrictions on outdoor sound amplification devices, and the added hour for outdoor venues, "[o]utside live musical performances associated with a non-residential establishment shall meet the outdoor venue regulations of subsection (b) of this section or obtain special permits pursuant to [C]hapter 27, article IV, entitled 'Special Permits.'" Jupiter Code § 13-107(a)(3); D.E. 173 at 4. The Code does not appear to limit Chapter 27 special permits to any specific hours. *See* Jupiter Code § 27-370(b)(1) (stating generally that special permits can include "[l]imits to the hours of operation"). So, as the district court explained, Jupiter requires "any person wanting to have an outdoor live musical performance on . . . non-residential property [to] obtain a special event permit from the Town *or* approval from the Town Council for an outdoor venue[.]" D.E. 173 at 6 (emphasis added).

## II

"[A] preliminary injunction in advance of trial is an extraordinary remedy." *Bloedorn v. Grubs*, 631 F.3d 1218, 1229 (11th Cir. 2011). To obtain a preliminary injunction, a litigant like Harbourside must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) [that] the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) [that,] if issued, the injunction would not be adverse to the public interest." *Lebron v. Sec'y,*

5

*Fla. Dep't of Children and Families*, 710 F.3d 1202, 1206 (11th Cir. 2013) (citation omitted).

Before we begin, a word about the standard of review is in order. As a general matter, we review a preliminary injunction ruling for abuse of discretion. *See, e.g., Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018); *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). Although we can sometimes decide legal issues conclusively in preliminary injunction appeals, as in *Burk v. Augusta Richmond Cty.*, 365 F.3d 1247, 1250 (11th Cir. 2004), the Supreme Court has said that "limited [abuse of discretion] review normally is appropriate." *Thornburg v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 755 (1986), *overruled on other grounds by Planned Parenthood v. Casey*, 505 U.S. 833 (1992). *See, e.g., Ashcroft v. A.C.L.U.*, 542 U.S. 656, 666 (2004) (concluding that the district court's determination as to likelihood of success "was not an abuse of discretion"); *Brown v. Chote*, 411 U.S. 452, 457 (1973) ("In reviewing such interlocutory relief, this Court may only consider whether issuance of the injunction constituted an abuse of discretion . . . . In doing so, we intimate no view as to the ultimate merits of appellee's contentions."); *Callaway v. Block*, 763 F.2d 1283, 1287 n.6 (11th Cir. 1985) ("[W]hen an appeal is taken from the grant or denial of a preliminary injunction, the reviewing court will go no further into the merits than is necessary to decide the interlocutory appeal."); *Martinez v. Matthews*, 544 F.2d 1233, 1242–43

(5th Cir. 1976) ("Appellate courts especially must not go beyond a very narrow scope of review, for these preliminary [injunction] decisions necessarily entail very delicate trial balancing.").

We follow the traditional path of limited review in this appeal and ask only whether the district court abused its discretion in concluding that Harbourside failed to establish a substantial likelihood of success on the merits of its claims. *See LSSi Data Corp. v. Comcast Phone LLC*, 696 F.3d 1114, 1120 (11th Cir. 2012) ("The first question before us is whether the District Court abused its discretion in concluding that LSSi had shown a 'substantial likelihood of success' on the merits of its claim.") (citation omitted). We do this for two reasons. First, the parties had not engaged in full-blown discovery at the time of the preliminary injunction hearing, and as a result the district court had a limited record. Second, on appeal the parties have failed to cite or discuss a Supreme Court case that we believe is relevant to Harbourside's First Amendment claims. *See GeorgiaCarry.Org v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1327 (11th Cir. 2015) (declining to reach the merits of a Second Amendment claim in a preliminary injunction appeal because, among other things, the record was not fully developed and the parties had not briefed an important historical issue).

**III**

Harbourside argues that the district court clearly erred in finding that it did not satisfy the necessary criteria to be an outdoor venue under § 13-107(b)(1)–(6). *See* Br. for Appellant at 32–33.   Given the judicial preference for avoiding constitutional questions when possible, *see, e.g.*, *Camreta v. Greene*, 563 U.S. 692, 705 (2011), we address this contention first.

According to Harbourside, the district court incorrectly concluded that it failed to satisfy Condition 11 of Jupiter Resolution No. 2-13, which was passed by the Jupiter Town Council in February of 2013 and approved Harbourside Place as an outdoor venue subject to its meeting a number of conditions.  Condition 11 provided that, upon the submission of the final plans and prior to the issuance of any building permits, Harbourside had to revise its "statement of use" to note the installation, setting, and locking of a sound limiter so that the Harbourside Place's sound system would meet Jupiter's sound level regulations.  As Harbourside sees things, Condition 11 applies only upon the submission of final plans and prior to the issuance of any building permits.  Because building permits were already issued for Harbourside Place, and because the property opened in 2014, Harbourside submits that there was no need to again revise the statement of use to satisfy Condition 11.

We are not persuaded by Harbourside's argument.  The district court did not base its outdoor venue finding solely on Harbourside's failure to meet Condition 11. Instead, it found that Harbourside Place had failed to meet "all" the conditions

8

necessary to be an outdoor venue, and that Harbourside Place "repeatedly exceeded" permitted noise levels. *See* D.E. 173 at 6–7. We recognize that Harbourside presented evidence to support its position—for example, the testimony of Nick Mastroiaonni (the Vice President of Allied Capital, the developer of Harbourside Place)—but the district court's findings are supported by four components of the record and are not clearly erroneous. *See generally Amadeo v. Zant*, 486 U.S. 214, 226 (1988) (explaining that a finding is not clearly erroneous if there are "two permissible views of the evidence") (citation and internal quotation marks omitted).

First, John Sickler, Jupiter's director of zoning, stated in his affidavit that the approval of Harbourside's amphitheater as an outdoor venue in February of 2013 under Resolution No. 2-13 did not permanently establish Harbourside as a certified outdoor venue. Harbourside Place still had to satisfy all relevant code requirements to be considered an outdoor venue. *See* D.E. 102-1 at ¶¶ 22–30.

Second, Roger Held, a Jupiter building official who issued the certificate of occupancy for Harbourside Place, confirmed Mr. Sickler's testimony. Mr. Held stated in his affidavit that the certificate of occupancy did not certify Harbourside Place's compliance with any aspects of the Jupiter Code relating to uses of the property. *See* D.E. 103-1 at ¶¶ 4–5.

Third, Stephanie Thoburn, Jupiter's assistant director of zoning and planning, explained in her affidavit that Harbourside had failed to satisfy several of the outdoor

9

venue requirements. These included, but were not limited to, the failure to follow Condition 11. For example, according to Ms. Thoburn, Harbourside also did not satisfy the applicable exterior sound standards and its site plan did not identify all the items required by the Jupiter Code. *See* D.E. 99-1 at ¶ 32(e)–(f). The later sound studies submitted by Harbourside, moreover, were deficient. The March 2014 study did not meet code requirements and did not include details of the speakers and proposed outdoor stage, while the September 2015 study did not include a site plan or measure site level compliance at the property. *See id.*

Fourth, affidavits submitted by Edward Dugger and Gary Siebein, architects who work in the field of acoustical engineering and who provided consulting services to Jupiter, indicated that Harbourside Place exceeded applicable sound standards during a number of special-permit and non-permit events in March, May, and October of 2015 and February and August of 2016. *See* D.E. 100-1 at ¶¶ 10–18; D.E. 101-1 at ¶¶ 8–21. Mr. Dugger also stated in his affidavit that, during certain events at Harbourside Place, the sound limiter sometimes did not work and was being bypassed. *See* D.E. 100-1 at ¶ 14.

The district court credited the testimony of Mr. Sickler, Mr. Held, Ms. Thoburn, Mr. Dugger, and Mr. Siebein. *See* D.E. 173 at 6–7. So, even if Harbourside was generally correct about Condition 11, it has not successfully challenged the other deficiencies that prevented it from achieving outdoor venue

10

status under Resolution 2-13.  The district court's factual findings stand, and as a result we must address Harbourside's First Amendment claims.

## IV

Harbourside asserts that the provisions of the Jupiter Code summarized in Part II, on their face, constitute content-based regulations of speech that violate the First Amendment.  Harbourside also contends that the special permit requirement for live musical performances constitutes an unconstitutional prior restraint.  *See* Br. for Appellant at 15–32.

## A

The First Amendment prohibits laws "abridging the freedom of speech."  U.S. Const. amend. I.  And music, the Supreme Court has held, constitutes protected First Amendment expression. *See Ward v. Rock Against Racism*, 491 U.S. 781, 790–91 (1989).

We acknowledge that it can be tricky (some might even say reckless) to set out black-letter principles governing the First Amendment.  But we think we are on safe ground in saying that noise ordinances generally do not violate the First Amendment if they are content-neutral and do not single out any specific type of speech, subject-matter, or message.  For example, the Supreme Court has explained that "a prohibition against the use of sound trucks emitting 'loud and raucous' noise in residential neighborhoods is permissible if it applies equally to music, political

speech, and advertising." *City of Cincinnati v. Discovery Network*, *Inc.*, 507 U.S. 410, 428–29 (1993) (citing *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949) (plurality opinion)). *See generally* 6A McQuillin, The Law of Municipal Corporations § 24:106 (3d ed July 2019) ("A municipal corporation . . . may reasonably regulate . . . the use of sound amplifiers and motor vehicles carrying such devices . . . . [but the] ordinance should be narrowly drawn to avoid specific evils . . . and so as not to infringe on the freedoms embodied in the First Amendment.").

On the other hand, content-based laws which "target speech based on its communicative content" are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218, 2226 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. *See also Dana's R.R. Supply v. Att'y Gen. of Fla.*, 807 F.3d 1235, 1246 (11th Cir. 2015) (quoting *Reed* and adopting its formulation).

In order to determine whether a regulation of speech is content based, we must first consider whether, "on its face," it "draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227 (internal quotation marks omitted). We may also consider whether the regulation was enacted due to an impermissible motive, i.e., the suppression of free expression. *See id.* at 2228. *See also Ward*, 491

U.S. at 791 (1989) ("The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.").  When a regulation is content based on its face, strict scrutiny applies and there is no need for the speaker to also show an improper purpose.  *See Reed*, 135 S. Ct. at 2228.

**B**

We begin with §§ 13-107(a)(1) and 13-107(b) of the Jupiter Code.  The district court, as we explain, did not abuse its discretion concluding that Harbourside failed to show a substantial likelihood of success on its First Amendment challenges to these provisions.

On its face, the sound amplification restrictions set out in § 13-107(a)(1) apply during certain hours to all outdoor amplification of sound (no matter what speech or sound is being amplified or what message is being conveyed).  Similarly, on its face the outdoor venue requirements contained in § 13-107(b) apply to all outdoor facilities (no matter what speech or sound is being uttered or what message is being conveyed).  We see nothing in these provisions that differentiates treatment based on the content (i.e., subject-matter) of the speech or sound at issue or the message or viewpoint of the speaker.  *Compare Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) (holding that a city ordinance requiring all individuals to obtain a permit before conducting an event with more than 50 persons was a content-neutral time,

13

place, and manner regulation of a public forum because officials were not authorized to consider or pass on the content of speech and the grounds for the denial of a permit had nothing to do with what a speaker might say), *and Ward*, 491 U.S. at 791–92 (New York City regulation requiring all performers at the Central Park bandshell to use the City's sound amplification equipment and sound technician was content neutral), *with Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc) ("The record-keeping, inquiry, and anti-harassment provisions of FOPA are speaker-focused and content-based restrictions.  They apply only to the speech of doctors and medical professionals, and only on the topic of firearm ownership.").

## C

That leaves § 13-107(a)(3), which provides (emphasis ours) that "[o]utside live musical performances associated with a non-residential establishment shall meet the outdoor venue regulations . . . *or* obtain special permits[.]"  As the Supreme Court has recognized, "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). *See also Dana's R.R. Supply*, 807 F.3d at 1246 ("Florida's no-surcharge law proves difficult to categorize, skirting the line between targeting commercial speech and restraining speech writ large."); Note, *Free Speech Doctrine after Reed v. Town of Gilbert*, 129 Harv. L. Rev. 1981, 1983 (2016) ("In practice,

14

. . . the content distinction is quite messy and only roughly tracks the division between permissible and impermissible regulation."). As we explain, the characterization of § 13-107(a)(3) turns out to be a very tricky matter.[3]

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. *See also Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972) ("[T]wo parades cannot march on the same street simultaneously, and government may allow only one."); 1 Rodney Smolla, *Smolla and Nimmer on Freedom of Speech* § 3.9 (2019) ("A content-based regulation either explicitly or implicitly presumes to regulate speech on the basis of the substance of the message."). Government discrimination among viewpoints is a more blatant and egregious form of content discrimination. *See Reed*, 135 S. Ct at 2230. "[A]ll viewpoint discrimination is first content discrimination, but not all content discrimination is viewpoint discrimination." 1 Smolla, *Freedom of Speech* § 3:9.

Jupiter asserts, and the district court concluded, that § 13-107(a)(3) is content-neutral because it does not single out or discriminate against any musical genres,

---

[3] As noted earlier, a regulation of speech can be content based if it targets content or viewpoint on its face or if it was enacted due to an impermissible motive, i.e., the suppression of free expression. *See Reed*, 135 S. Ct. at 2228. The district court found, as a factual matter, that Jupiter did not adopt Ordinance 1-16 "in order to target or retaliate against Harbourside, or as a means of controlling the content of musical performances at Harbourside [Place]." D.E. 173 at 7. That finding is not clearly erroneous, so the remaining question for us is whether the district court abused its discretion in ruling that § 13-107(a)(3) is, on its face, content neutral.

15

topics, or messages.  *See* D.E. 173 at 6–7.  If the question is whether the regulation "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred," *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (citation omitted), the district court was likely right.  After all, § 13-107(a)(3) allows non-live (i.e., recorded) music; applies to all live musical performances regardless of type (i.e., both vocal and instrumental); and does not favor classical over country, gospel over grunge, hip hop over heavy metal, or rock over rap.  *See Casey v. City of Newport*, 308 F.3d 106, 111, 120 (1st Cir. 2002) (plurality opinion) (concluding, pre-*Reed*, that municipal no-amplification restriction as to singing, and municipal restriction prohibiting singing, were both content neutral).  *Compare Reed*, 135 S. Ct. at 2230 ("a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed"), *with* Enrique Armijo, *Reed v. Town of Gilbert: Relax, Everybody*, 58 B.C. L. Rev. 65, 93 (2017) (asserting that a ban on all bumper stickers is content neutral because, "at most, it is aimed at a mode of expression, not expression itself").  Moreover, it does not target or discriminate against any specific message or viewpoint within any musical genre.

Yet it is undeniable that § 13-107(a)(3) applies to one medium, and one medium only—that of live musical performances—while allowing other live events

16

that produce sound (e.g., a political speech, a religious sermon, an educational presentation, an aerobics class, or a poetry reading).  Although "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975), there is language in *Reed* which suggests that some "more subtle" facial distinctions might be content based if they "defin[e] regulated speech by its function or purpose."  *Reed*, 135 S. Ct. at 2227.  That language is dicta, however, because the Supreme Court did not apply it.  *See also* Eugene Volokh, The First Amendment and Related Statutes 359–60 (6th ed. 2016) (suggesting that content-based regulations include, but are not limited to, restrictions based on subject-matter, viewpoint, and function or purpose).

As Harbourside points out, "[l]ive musical performance, as opposed to commercially available recorded music, may also contain improvisation of musical notes, lyrics, and vocalization, as well as physical and vocal expression."  Br. for Appellant at 20.  *Cf. D.A. Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1266 (11th Cir. 2007) (concluding that a municipal noise ordinance was not content-based because "[o]n its face" it did not "disallow certain types of recorded noise or particular viewpoints").  There is also the potential problem, not mentioned by Harbourside, that some performers, groups, or bands may not have recorded any of

17

their performances, leaving them without a feasible alternative method of presenting and communicating their music.

When seen from this perspective, there is an argument that § 13-107(a)(3) should be characterized as a content-based regulation. Take, for example, the Ninth Circuit's decision in *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) (en banc). In that case, the en banc Ninth Circuit held, in relevant part, that a city rule restricting street performers actively requesting donations constituted a content-based regulation because it singled out speech based on the idea expressed (i.e., the active request of donations). *See id.* at 1051–52. In his separate opinion, Judge Smith articulated a theory which in part supports Harbourside's position here: "[The rule] *singles out a particular group that is defined, in part, by the medium through which they express themselves* and the substantive message they convey." *Id.* at 1092 (Smith, J., concurring in part and dissenting in part) (emphasis added). Judge Smith's view finds some (albeit limited) support in the caselaw. *See Casey*, 308 F.3d at 121 (McAuliffe, D.J., concurring) (suggesting that a ban on sound amplification might be content based because it "effectively, albeit unwillingly, banned a whole host of musical instruments and, necessarily, the unique musical messages that can only be produced by those instruments"); *Morris v. 702 East Fifth Street HDFC*, 778 N.Y.S. 2d 20, 23 (App. Div. 1st Dept. 2004) (concluding, in the context of a commercial lease dispute, that a lower court preliminary injunction—

18

which allowed the leaseholder to open a coffee house/performance space but limited any live musical performances to string instruments during certain hours—violated the "First Amendment rights of the instrumental music performers . . . by limiting their performances to string instruments" without furthering a legitimate governmental interest).  *Cf.* Kolby Marchand, *Free Speech and Signage After Reed v. Town of Gilbert: Signs of Change from the Bayou State*, 44 So. U. L. Rev. 181, 193 (2017) ("as long as the regulation d[oes] not attempt to ban concerts held in the area altogether, but only require[s] the sound to be below a certain level at those concerts, then there would still be an open avenue for the expression").

On the other hand, there are countervailing considerations.  A non-residential establishment in Jupiter can play recorded music of any kind (assuming compliance with other provisions of the Code, such as those dealing with outdoor sound amplification), so music is not targeted generally or specifically.  Viewed this way, § 13-107(a)(3) looks more like a content-neutral time, place, and manner regulation.  As Justice Souter put it in his separate opinion in *Hill v. Colorado*, 530 U.S. 703, 735–36 (2000) (Souter, J., concurring): "Concern about employing the power of the [government] to suppress discussion of a subject or a point of view is not . . . raised in the same way when a law addresses not the content of speech but the circumstances of its delivery . . . . Unless regulation limited to the details of a speaker's delivery results in removing a subject or viewpoint from effective

19

discourse (or otherwise fails to advance a significant public interest in a way narrowly fitted to that objective), a reasonable restriction intended to affect only the time, place, or manner of speaking is perfectly valid." *See also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 526–27 (1981) (Brennan, J., concurring) ("The characterization of the San Diego [billboard] regulation as a total ban of a medium of communication . . . suggests a First Amendment analysis quite different from the plurality's . . . . I would apply the tests this Court has developed to analyze content-neutral prohibitions of particular media of communication."); *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 72–76 (1981) (striking down, under both intermediate scrutiny and time, place, and manner standard, a municipal ordinance prohibiting live entertainment, including nude dancing, throughout the borough's commercial zones).

Harbourside relies on the Supreme Court's decision in *Discovery Network*, but that case cannot bear the weight that Harbourside puts on it. In *Discovery Network* the Supreme Court addressed the constitutionality of a city ordinance which prohibited the distribution of commercial handbills on public property and required the removal of newsracks belonging to commercial enterprises while permitting newsracks belonging to newspapers. The Court held for a number of reasons that the ordinance violated the First Amendment, *see* 507 U.S. at 417–28, and rejected the contention that the ordinance was content neutral: "[T]he very basis for the

regulation is the difference in content between ordinary newspapers and commercial speech . . . . Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content-based.'" *Id.* at 429.

As this quote demonstrates, *Discovery Network* is a different case, one in which the regulation was based upon the substantive content of the material placed in newsracks. Here, in contrast, § 13-107(a)(3) is not based on the genre, content, or viewpoint of the live musical performance. *Cf. Vugo, Inc. v. City of Chicago*, 273 F. Supp. 3d 910, 915–16 (N.D. Ill. 2017) (rejecting argument that city ban on commercial advertising on the inside or outside of commercial ride-share vehicles was content-based: "On its face, the ordinance is a broad ban on commercial advertising that applies in a narrow medium: transportation network vehicles. The ban does not distinguish among products or services advertised, nor does it single out certain speakers, subject matters, or purposes for differential treatment."). At the very least, *Discovery Network* does not dictate the outcome here.

One recent case we have found involving a content-based challenge to a noise ordinance, *Hassay v. Mayor of Ocean City*, 955 F. Supp. 2d 505 (D. Md. 2013), is not very helpful. The plaintiff, a violinist who performed as a street musician, challenged a provision of a city ordinance which prohibited radios, musical

21

instruments, phonographs, or sound amplification machines as "unreasonably loud noises" if the sound was "plainly audible" at a distance of 30 feet. *See id.* at 510. Because a separate provision of the ordinance treated human sound—yelling, shouting, hooting, whistling, or singing—as prohibited if it was "plainly audible" at a distance of 50 feet, the violinist argued that the former provision was content-based. *See id.* at 520 ("Hassay insists that Ocean City discriminates between one form of expression—instrument or machine-generated sound—and another form of expression—the human voice—and thus the ordinance is not content neutral."). The city, in response, asserted that the 30-foot audibility restriction was content-neutral because the "secondary effects of instruments or machine-generated sound differentiates those sounds from the human voice." *Id.* Unfortunately for us, the district court in *Hassay* did not resolve the content-based/content-neutral dispute because it held that the ordinance violated the First Amendment even under intermediate scrutiny. *See id.* So, aside from laying out the parties' arguments— which somewhat mirror those made here—*Hassay* does not provide us with much guidance.

Adding to the legal uncertainty is *Turner Broadcasting,* which involved the constitutionality of certain federal must-carry provisions that applied to cable networks but not television networks. The provisions required some cable networks (those with a certain number of active channels and/or more than a certain number

of subscribers) to carry several local commercial and public television stations. *See Turner Broadcasting*, 512 U.S. at 630–32. The cable companies that challenged the must-carry provisions argued that they formed content-based regulations which demanded strict scrutiny, but the Supreme Court disagreed. The must-carry provisions' burdens and benefits were "unrelated to content," and "distinguish[ed] between speakers in the television market . . . [based] upon the *manner* in which speakers transmit their messages to viewers, and not upon the messages they carr[ied]." *Id.* at 644–45 (emphasis added). *See also id.* at 652 ("In short, the must-carry provisions are not designed to favor or disadvantage speech of any particular content."). As a result, intermediate scrutiny—and not strict scrutiny—applied. *See id.* at 661–62.

In addressing the argument that the must-carry provisions were content-based because they differentiated between speakers, the Supreme Court stated that "speaker-based laws demand strict scrutiny when they reflect the [g]overnment's preference for what the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.* at 658. Turning to the contention that the must-carry provisions warranted strict scrutiny because they favored one set of speakers (television networks) over another (cable networks), the Court acknowledged that "[r]egulations that discriminate against media, or among different speakers within a single medium, often present serious First Amendment

23

concerns." *Id.* at 659. But it went on to explain that not all such regulations merit strict scrutiny: "It would be error to conclude, however, that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others . . . . [H]eightened scrutiny is unwarranted when the differential treatment is 'justified by some special characteristic of' the particular medium being regulated." *Id.* at 660–61 (citation omitted).

*Turner Broadcasting* is not directly on point, but it certainly is relevant to the issue before us. One of the arguments made by Jupiter, based on the affidavits of Mr. Dugger and Mr. Siebein, is that § 13-107(a)(3) is content-neutral because live musical performances—due to their nature—have the potential for less control of sound output, and as a result require certain measures to keep the music and vocals within prescribed levels for amplified sound. *See* Br. for Appellee at 36–37. This seems like an argument that is based on the reasoning in *Turner Broadcasting*, but inexplicably neither Jupiter nor Harbourside cite or discuss *Turner Broadcasting* in their briefs.[4]

Given the posture of the case, the lack of a fully-developed record, and the parties' failure to cite or discuss *Turner Broadcasting*, we think this is a good opportunity for us to practice judicial minimalism, and decide no more than what is necessary to resolve Harbourside's preliminary injunction appeal. *See generally*

---

[4] Indeed, the parties have failed to cite many of the authorities we discuss in this opinion.

24

Cass R. Sunstein, *One Case at a Time: Judicial Minimalism on the Supreme Court* 1-3 (1999). We therefore do not definitively decide whether § 13-107(a)(3) is on its face a content-based or content-neutral regulation of speech. We hold only that the district court did not abuse its discretion in denying injunctive relief due to Harbourside's failure to show a substantial likelihood of success on the merits. *See Cafe 207, Inc. v. St. Johns Cty.*, 989 F.2d 1136, 1137 (11th Cir. 1993) ("Whether the district court's determination of this point [substantial likelihood of success] is right or wrong, the record before us indicates no abuse of discretion.").

## C

A licensing or permitting requirement can constitute a prior restraint of speech. *See Conrad*, 420 U.S. at 554–57; *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017). Harbourside argues in its brief that the outdoor venue/special permit requirements in the Jupiter Code for live musical performances constitute a prior restraint that violates the First Amendment.

"Prior restraints are presumably unconstitutional and face strict scrutiny." *Burk*, 365 F.3d at 1251. Nevertheless, in some instances a "prior restraint may be approved if it qualifies as a regulation of the time, place, and manner of expression rather than a regulation of content." *Id.* Our cases teach that a "[p]rior restraint[ ] must (1) ensure that permitting decisions are made within a specified period of time and must (2) avoid unbridled discretion in the hands of a government official." *Café*

25

*Erotica of Fla., Inc. v. St. Johns Cty.*, 360 F.3d 1274, 1282 (11th Cir. 2004) (citation and internal quotation marks omitted).

Harbourside moved for injunctive relief before Jupiter enforced Ordinance 1-16. See Tr. of Preliminary Injunction Hearing, Vol. I, at 76. At the outset of the preliminary injunction hearing, Harbourside told the district court it was "not here on the other issues of vesting, of . . . prior restraints that occurred before," i.e., under the previous version of the Code. *See id.* at 21. Although Harbourside had asserted a prior restraint theory in a paragraph of its second amended motion for injunctive relief, *see* D.E. 44 at 22, it did not mention prior restraint in its opening statement or closing argument at the preliminary injunction hearing, and did not ask the district court at the hearing to invalidate on First Amendment grounds any of the special permit provisions found in Chapter 27 of the Jupiter Code. Indeed, Harbourside never explained to the district court (before, during, or after the hearing) why any of the Chapter 27 special permit provisions failed to satisfy the First Amendment principles set forth above. Not surprisingly, the district court did not address the matter of prior restraint in its order denying Harbourside's request for injunctive relief.

As a general rule, we do not consider an argument or theory that was not presented to the district court. *See, e.g., Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994). There are exceptions for "exceptional" circumstances, as laid out in

26

cases like *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004), and one of those exceptions gives us discretion to rule on an issue raised for the first time on appeal if it presents a pure question of law and failure to decide it would result in a miscarriage of justice. *See, e.g.*, *Twiss v. Kury*, 25 F.3d 1551, 1556 (11th Cir. 1994). Here our refusal to address the prior restraint argument will not result in a miscarriage of justice because Harbourside will be free to press that theory on remand and develop a record with respect to the Chapter 27 provisions it thinks are unconstitutional. We therefore do not consider Harbourside's prior restraint argument.

## V

We recognize that we have said a lot but decided relatively little. But we believe that is the proper approach on this record, and hopefully our discussion will lead to more sharpened and focused arguments on remand.

Because the district court did not abuse its discretion, we affirm its order denying Harbourside's motion for a preliminary injunction. In so holding, we express no views on the ultimate merits of Harbourside's claims.

**AFFIRMED.**