[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

Nos. 22-11133; 22-11143; 22-11144; 22-11145

_____

LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., et al.,

Plaintiffs-Appellees,

*versus*

FLORIDA SECRETARY OF STATE, et al.,

Defendants-Appellants,

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket Nos. 4:21-cv-00242-MW-MAF; 4:21-cv-00186-MW-
MAF; 4:21-cv-00187-MW-MAF; 4:21-cv-00201-MW-MJF

_____

Before NEWSOM, LAGOA, and BRASHER, Circuit Judges

PER CURIAM:

The district court here permanently enjoined three provisions of Florida law governing elections in that state.  It also subjected Florida to a "preclearance" regime whereby the state—for the next decade—must seek and receive the district court's permission before it can enact or amend certain election laws.  The state now asks us to stay that decision pending appeal.  After careful consideration, we grant the state's motion.[1]

## I

Florida's governor signed Senate Bill 90 into law on May 6, 2021.  Plaintiffs sued, challenging four of SB90's provisions, three of which are relevant here:  (1) a provision regulating the use of drop boxes for collecting ballots (the "Drop-Box Provision"), Fla. Stat. § 101.69(2)–(3); (2) a provision requiring third-party voter-registration organizations to deliver voter-registration applications to the county where an applicant resides within a proscribed period of time (the "Registration-Delivery Provision") and specifying

---

[1] We note that we write only for the parties' benefit.  Because an "order[] concerning [a] stay[ is] not a final adjudication of the merits of the appeal, the tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1280 n.1 (11th Cir. 2020) (quotation marks omitted).

information that third-party voter-registration organizations must provide to would-be registrants (the "Registration-Disclaimer Provision"), Fla. Stat. § 97.0575(3)(a); and (3) a provision prohibiting the solicitation of voters within 150 feet of a drop box or polling place (the "Solicitation Provision"), Fla. Stat. § 102.031(4)(a)–(b).[2]

Plaintiffs[3] challenged those provisions, as relevant here, on several grounds. First, they asserted that the provisions discriminated on the basis of race in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act. Second, they contended that the Solicitation Provision was unconstitutionally vague or overbroad in violation of the First and Fourteenth Amendments. And finally, they argued that the Registration-Disclaimer Provision compelled speech in violation of the First Amendment.

---

[2] Plaintiffs also challenged a provision governing mail-in voting, Fla. Stat. § 101.62(1), but the district court rejected plaintiffs' contentions regarding that provision and refused to enjoin it. Accordingly, that provision is not relevant to the state's motion for a stay pending appeal.

[3] On appeal, we consolidated four separate cases. Each set of plaintiffs has brought slightly different claims: The Harriet Tubman Freedom Fighters challenge only the Registration-Disclaimer Provision; The League of Women Voters challenge only the Registration-Disclaimer and Solicitation Provisions; and Florida NAACP and Florida Rising Together challenge all four provisions. For simplicity's sake—and because plaintiffs' claims are all interwoven—we will address each claim generally rather than specifying which plaintiff goes with which claim.

The district court largely agreed with plaintiffs that "SB 90 runs roughshod over the right to vote, unnecessarily making voting harder for all eligible Floridians, unduly burdening disabled voters, and intentionally targeting minority voters." Specifically, the court held that all of the above-mentioned provisions were intentionally discriminatory, violating the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act. Moreover, the court held that the Solicitation Provision violated the First and Fourteenth Amendments because it was unconstitutionally vague and overbroad. And it held that the Registration-Disclaimer Provision violated the First Amendment because it impermissibly compelled speech.

Accordingly, the district court permanently enjoined those provisions of SB90. It then sua sponte considered whether it would stay the injunction pending appeal and refused to do so. Finally, based on its determination that the Florida legislature had intentionally discriminated against black voters, the court subjected Florida to "preclearance" under Section 3 of the VRA: For the next decade, it held, "Florida may enact no law or regulation governing [third-party voter-registration organizations], drop boxes, or line-warming activities without submitting such law or regulation" to the district court for its advance approval. The state now moves this Court to stay the district court's decision pending appeal.

## II

## A

Under the "'traditional' standard for a stay," we "consider[] four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). But of course, that "traditional" four-factor standard does not always apply. For example, in some circumstances—namely, "when the balance of equities . . . weighs heavily in favor of granting the stay"—we relax the likely-to-succeed-on-the-merits requirement. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (quotation marks omitted). In that scenario, the stay may be "granted upon a lesser showing of a 'substantial case on the merits.'" *Id.* (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 26, 1981)).

Under what has come to be called the "*Purcell* principle," *see Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), the "traditional test for a stay" likewise "does not apply" in the particular circumstance that this case presents—namely, "when a lower court has issued an injunction of a state's election law in the period close to an election," *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022)

(Kavanaugh, J., concurral).[4]  In such a case, an appellate court considering a stay pending appeal is "required to weigh . . . considerations specific to election cases."  *Purcell*, 549 U.S. at 4–5.  For instance, the reviewing court must be cognizant that "orders affecting elections . . . can themselves result in voter confusion."  *Id.* at 4–5.  And that risk only increases as an election draws closer.  *Id.* at 5.  For that reason, the *Purcell* principle teaches that "federal district courts ordinarily should not enjoin state election laws in the period close to an election."  *Milligan*, 142 S. Ct. at 879 (Kavanaugh, J., concurral).  And if a district court violates that principle, the appellate court "should stay [the] injunction[]," *id.*, often (as it could not do under the "traditional" test) while "express[ing] no opinion" on the merits.  *Purcell*, 549 U.S. at 5.

So, an important question:  When is an election sufficiently "close at hand" that the *Purcell* principle applies?  *Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurral).  As the district court noted, the Supreme Court has never specified precisely what it means to

---

[4] We note plaintiffs' contention that the state has "waived" any argument that the *Purcell* principle applies because it "never raised *Purcell* below as a basis for denying injunctive relief."  We disagree.  We are doubtful that the *Purcell* principle is subject to the ordinary rules of waiver (or perhaps more accurately here, forfeiture, *see United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc)).  As when considering jurisdictional limitations, we have an independent obligation to "weigh . . . considerations specific to election cases."  *Purcell*, 549 U.S. at 4.  When we are "[f]aced with an application to enjoin" voting laws close to an election—or, as here, a request to stay such an injunction—we are "*required* to weigh" the injunction's impact for an upcoming election.  *Id.* (emphasis added).

be "on the eve of an election" for *Purcell* purposes. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). In *Purcell* itself, the Court stayed an injunction that a lower court had issued "just weeks before the election." *Purcell*, 549 U.S. at 4. In *Milligan*, by contrast, the Court granted a stay even though the primary election was still "about four months" away. *Milligan*, 142 S. Ct. at 888 (Kagan, J., dissenting).[5]

Whatever *Purcell*'s outer bounds, we think that this case fits within them.[6] When the district court here issued its injunction, voting in the next statewide election was set to begin in *less* than four months (and local elections were ongoing). Moreover, the district court's injunction implicates voter registration—which is currently underway—and purports to require the state to take action now, such as re-training poll workers. And although the district court satisfied itself that its injunction—including the requirement that the state preclear new voting rules—was not too draconian, we are reminded that "[e]ven seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with

---

[5] *See also Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir.) (per curiam) (noting that a stay was warranted in light of *Purcell* notwithstanding its observation that the election was "months away"), *motion to vacate stay denied*, No. 19A1054, 2020 WL 3456705 (U.S. 2020).

[6] It may be, in marginal cases, that "[h]ow close to an election is too close" will depend on a number of factors. *Milligan*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurral). But because we determine that this case easily falls within the time period that triggered *Purcell* in *Milligan*, we need not endeavor to articulate *Purcell*'s precise boundaries.

8                           Order of the Court                      22-11143

administration of an election and cause unanticipated conse-quences." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurral).

Because the election to which the district court's injunction applies is close at hand and the state "has a compelling interest in preserving the integrity of its election process," *Purcell* controls our analysis. *Purcell*, 549 U.S. at 4 (quotation marks omitted).

## B

Of course, even under *Purcell*, a state's interest in proceed-ing under challenged election procedures is not "absolute." *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurral). Instead, we agree with Justice Kavanaugh that *Purcell* only (but significantly) "heightens" the standard that a plaintiff must meet to obtain in-junctive relief that will upset a state's interest in running its elec-tions without judicial interference. *Id.*[7] In Justice Kavanaugh's view, the plaintiff must demonstrate, among other things, that its position on the merits is "entirely clearcut." *Id.* Whatever the pre-cise standard, we think it clear that, for cases controlled by *Purcell*'s analysis, the party seeking injunctive relief has a "heightened" bur-den.

---

[7] To put it slightly differently, *Purcell* stands for the proposition that when an election is close at hand, it is "ordinarily" improper to issue an injunction. *Milligan*, 142 S. Ct. at 879 (Kavanaugh, J., concurral). That leaves room for the "extraordinary" case where an injunction—despite its issuance on the eve of the election—might be proper.

Here, of course, we have the converse of that situation. The plaintiffs in this case have already obtained injunctive relief upsetting the previously applicable state election procedures, and the question before us is whether the state is entitled to a stay pending appellate review of the district court's injunction. In that posture, it seems to us, *Purcell* effectively serves to *lower* the state's bar to obtain the stay it seeks. The state need not show, for instance—as a plaintiff would to obtain a "late-breaking injunction" in the first place—that its position is "entirely clearcut," *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurral). Rather, it need only show that plaintiffs' position is *not*.[8]

Accounting for *Purcell*, we hold that the state is entitled to a stay of the district court's order enjoining the operation of SB90's Drop-Box, Registration-Delivery, and Solicitation Provisions and subjecting Florida to preclearance. The district court's determination regarding the legislature's intentional discrimination suffers from at least two flaws, either of which justifies a stay. And, although we think it presents a closer question, we hold that the district court's determination that the Solicitation Provision is

---

[8] We are of course aware that Justice Kavanaugh provided three additional factors—*all* of which must be satisfied to justify an injunction under *Purcell*. *See Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurral). But because we determine that the underlying merits of the district court's order in this case are vulnerable on several grounds, we need not go any further.

unconstitutionally vague and overbroad is sufficiently vulnerable to warrant a stay.[9]

**i**

The first two flaws come from the district court's determination that SB90 is the product of intentional race discrimination. That inquiry is guided by an eight-factor test—the first five of which come from the Supreme Court's opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and the remaining three from our ensuing caselaw. We have summarized the *Arlington Heights* factors as follows: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators." *Greater Birmingham Ministries v. Sec'y of State for Al.*, 992 F.3d 1299, 1322 (11th Cir. 2021) ("*GBM*"); *see also Arlington Heights*, 429 U.S. at 266–68. And we have added the following considerations: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1322.

---

[9] We decline to weigh in on the merits of the Registration-Disclaimer Provision. That provision has been repealed by a newly enacted statute, which Florida's Governor has already signed. That law will go into effect—thereby mooting any challenge to the Registration-Disclaimer Provision—as soon as the district-court-ordered preclearance regime ceases to operate. And that regime will cease to operate upon the issuance of this opinion.

*First*, we find the district court's historical-background analysis to be problematic. We have been clear that "old, outdated intentions of previous generations" should not "taint [a state's] legislative action forevermore on certain topics." *Id.* at 1325. To that end, *Arlington Heights*'s "historical background" factor should be "focus[ed] . . . on the 'specific sequence of events leading up to the challenged decision'" rather than "providing an unlimited lookback to past discrimination." *Id.* (quoting *Arlington Heights*, 429 U.S. at 267); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) ("'The 'historical background' of *a legislative enactment* is 'one evidentiary source' relevant to the question of intent." (emphasis added) (quoting *Arlington Heights*, 429 U.S. at 267)).

In its assessment of SB90's historical background, the district court led with the observation that "Florida has a grotesque history of racial discrimination." It began its survey of that history beginning immediately after the Civil War and marched through past acts of "terrorism" and "racial violence" that occurred during the early and mid-1900s. And it concluded by seeming to chide the Supreme Court for suggesting that "[o]ur country has changed" since the Voting Rights Act was enacted in 1965. *Shelby County v. Holder*, 570 U.S. 529, 557 (2013). At least on our preliminary review, the district court's inquiry does not seem appropriately "focus[ed]" or "[]limited," as *GBM* requires. 992 F.3d at 1325.

*Second*, the district court failed to properly account for what might be called the presumption of legislative good faith. The Supreme Court has instructed that when a court assesses whether a

duly enacted statute is tainted by discriminatory intent, "the good faith of the state legislature must be presumed." *Perez*, 138 S. Ct. at 2324 (cleaned up).

For starters, in its 288-page opinion, the district court never once mentioned the presumption. And while we do not require courts to incant magic words, it does not appear to us that the district court here meaningfully accounted for the presumption at all. For instance, the court imputed discriminatory intent to SB90 based in part on one legislator's observation, when asked about the law's potentially disparate impact, that based on "the patterns of use" some voters "may have to go about it a little different way" once SB90 becomes law. Applying the presumption of good faith—as a court must—that statement by a single legislator is not fairly read to demonstrate discriminatory intent by the state legislature. Moreover—even if we do not presume good faith—that statement at worst demonstrates an "awareness of consequences," which is insufficient to establish discriminatory purpose. *Cf. Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose' . . . implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' and not merely 'in spite of,' its adverse effects upon an identifiable group.").

ii

Separate and apart from its intentional-discrimination finding, the district court determined that the Solicitation Provision was unconstitutionally overbroad and vague. Although we think

that issue presents a closer call than the intentional-discrimination finding, the state has met its burden to obtain a stay.

The Solicitation Provision precludes any "person, political committee, or other group or organization" from "solicit[ing] voters inside the polling place" or within 150 feet thereof.  Fla. Stat. § 102.031(4)(a).  And it defines "solicit" as follows:

> [S]eeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; selling or attempting to sell any item; and engaging in any activity with the intent to influence or effect of influencing a voter.

*Id.* § 102.031(4)(b).

The district court held that the language "engaging in any activity with the intent to influence or effect of influencing a voter" was impermissibly vague because it "fails to put Floridians of ordinary intelligence on notice of what acts it criminalizes" and because it "encourages arbitrary and discriminatory enforcement."  And it determined it was also unconstitutionally overbroad because it "prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits."

The state has a substantial argument that the statute passes constitutional muster.  First, as to vagueness, the state correctly points out that the panel that ultimately decides the merits of its appeal might determine that the language the district court found problematic is limited by the surrounding examples of prohibited conduct.  *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated.").

Turning to overbreadth, we note that "succeeding on a claim of substantial overbreadth is not easy to do."  *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1371 (11th Cir. 2021) (quotation omitted).  And the district court below failed to contend with any of the "plainly legitimate" applications of the Solicitation Provision, and thereby arguably failed to balance its legitimate applications against its potentially unconstitutional applications.  *See Williams*, 553 U.S. at 292 ("[W]e have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." (emphasis omitted)).

Therefore, the underlying merits of the vagueness and overbreadth challenges to the Solicitation Provision, at the very least, aren't "entirely clearcut."  *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurral).

22-11143                Order of the Court                15

★  ★  ★

In the circumstances of this case, and accounting for the fact that our review is governed by *Purcell*, we conclude that the state is entitled to a stay pending appeal.  The motion for a stay pending appeal is **GRANTED**.