[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13038

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JORGE CESAR FERRETIZ-HERNANDEZ,
a.k.a. Jorge Cesar Ferretiz,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:21-cr-00063-JA-PRL-1

_____

2                    Opinion of the Court                    22-13038

_____

No. 22-13039

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

IGNACIO FELIX-SALINAS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:21-cr-00070-JA-PRL-1

_____

_____

No. 22-13307

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ELIAS CHIROY-CAC,
a.k.a. Hiber Escalante-Roblero,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:21-cr-00075-JA-PRL-1

_____

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The defendants in these consolidated appeals challenge the constitutionality of 8 U.S.C. § 1326, which criminalizes unlawfully reentering the United States after a prior removal. They argue that § 1326 violates the equal protection component of the Fifth Amendment's Due Process Clause by discriminating against Mexican and other Latin American immigrants. Their theory is that the statute's predecessor—the Undesirable Aliens Act of 1929—was enacted with discriminatory intent, and that § 1326, first codified in 1952 and amended several times thereafter, perpetuates that taint.

Each of our sister circuits that has considered this theory has rejected it.[1] After carefully considering the parties' briefs and record, and with the benefit of oral argument, so do we.

## I. Background

Jorge Cesar Ferretiz-Hernandez is a Mexican national. In 2002, he was convicted of conspiracy to distribute and possess with intent to distribute methamphetamine. After completing his 121-month prison sentence in 2011, he was removed to Mexico. In 2017, he was arrested in the United States for failing to identify himself to law enforcement. In 2018, he was again removed to Mexico. In 2021, he was arrested in the United States for possessing cocaine. The Government indicted him under 8 U.S.C. § 1326(a) for unlawfully reentering the United States. The indictment also alleged that he was eligible for a sentencing enhancement under § 1326(b)(2), which allows a higher statutory maximum sentence if the defendant was previously deported following a conviction for an aggravated felony.

Ignacio Felix-Salinas, also a Mexican national, was convicted in the United States in 2000 of racketeering conspiracy. After

---

[1] *See United States v. Suquilanda*, 116 F.4th 129, 139 (2d Cir. 2024); *United States v. Wence*, No. 22-2618, 2023 WL 5739844, at *3 (3d Cir. 2023) (unpublished); *United States v. Sanchez-Garcia*, 98 F.4th 90, 94 (4th Cir. 2024); *United States v. Barcenas-Rumualdo*, 53 F.4th 859, 863 (5th Cir. 2022); *United States v. Viveros-Chavez*, 114 F.4th 618, 622 (7th Cir. 2024), *cert. denied,* 220 L. Ed. 2d 405 (Jan. 13, 2025); *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1138 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 703 (2024); *United States v. Amador-Bonilla*, 102 F.4th 1110, 1113 (10th Cir. 2024).

22-13038　　　　　　　Opinion of the Court　　　　　　　　5

serving a 57-month sentence, he was removed to Mexico in 2004. He unlawfully reentered the United States and, in 2008, was convicted of possessing a firearm as a convicted felon. He was again removed in 2009. In 2021, he was arrested in the United States for driving on a suspended license and for violating Florida Statute § 790.19.[2] Like Ferretiz-Hernandez, he was charged under § 1326(a), with the Government alleging an enhancement under § 1326(b)(2).

Elias Chiroy-Cac is a Guatemalan national who was removed from the United States in 2009. In 2020, he was found again in the United States after being arrested for driving under the influence, leaving the scene of an accident, and driving without a valid license. He was charged with unlawful reentry under § 1326(a).

Each defendant moved to dismiss their respective indictment, asserting that § 1326 violates the Fifth Amendment's guarantee of equal protection.[3] Relying on the *Arlington Heights*

---

[2] Fla. Stat. § 790.19 says: "Whoever, wantonly or maliciously, shoots at, within, or into, or throws or hurls or projects a stone or other hard substance which would produce death or great bodily injury . . . into . . . any public or private building [or vehicle] . . . shall be guilty of a felony of the second degree . . . ."

[3] The defendants' cases were all transferred to the same District Judge. Although not formally consolidated, the cases proceeded together: each defendant filed a nearly identical motion to dismiss supported by the same evidence, and the District Court issued nearly identical rulings.

framework,[4] they argued that the statute carried forward the discriminatory purpose of its statutory predecessor—the Undesirable Aliens Act of 1929—and continued to have a disparate impact on Mexican and Latino defendants. They supported their motions with expert declarations, legislative history, and statistical data.[5]

The Government opposed each defendant's motion to dismiss. It argued that § 1326 is subject only to rational-basis review and, in any event, would survive even under *Arlington Heights*. According to the Government, the defendants failed to show that the 1952 enactment of § 1326 or its later amendments were motivated by racial animus, and the defendants' evidence of disparate impact was insufficient to shift the burden.

Magistrate Judges in each case recommended denying the motions to dismiss the defendants' indictments. The reports assumed without deciding that the *Arlington Heights* framework applied but concluded that defendants had failed to establish a discriminatory purpose behind § 1326's enactment. The reports also

---

[4] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 97 S. Ct. 555 (1977).

[5] The defendants initially moved for an evidentiary hearing on their motions to dismiss. But at a status conference, the parties and the District Court discussed the possibility of filling additional exhibits in lieu of a hearing. The defendants then withdrew their request for an evidentiary hearing after the District Court allowed them to supplement the record with a transcript of two experts' testimonies from another case, *United States v. Gustavo Carrillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021), *rev'd & remanded*, 68 F.4th 1133 (9th Cir. 2023).

concluded that the statute easily satisfied rational-basis review. The District Court adopted those recommendations, overruled the defendants' objections, and denied the motions to dismiss.

Ferretiz-Hernandez and Felix-Salinas then entered conditional guilty pleas reserving their rights to appeal the constitutional issue. Chiroy-Cac proceeded to a stipulated bench trial and was adjudicated guilty. The District Court sentenced Ferretiz-Hernandez and Felix-Salinas to 46 months' imprisonment and Chiroy-Cac to time served, followed in each case by a term of supervised release.

All three defendants filed timely notices of appeal. We consolidated their appeals.

## II. Standard of Review

We review the District Court's denial of the defendants' motions to dismiss their indictments for abuse of discretion. *United States v. Palomino Garcia*, 606 F.3d 1317, 1322 (11th Cir. 2010). But to the extent those motions raise a constitutional challenge to the statute itself, our review is de novo. *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1377 n.3 (11th Cir. 2011).

Where, as here, the constitutional challenge turns in part on a factual determination—specifically, on whether Congress acted with a discriminatory purpose in enacting or reenacting the illegal reentry statute—we review that factual finding for clear error. *See Abbott v. Perez*, 585 U.S. 579, 607, 138 S. Ct. 2305, 2326

(2018).[6] Under that standard, we may reverse only if, after reviewing the entire record, we are left "with the definite and firm conviction that a mistake has been committed." *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018) (citation and internal quotation marks omitted).

## III. Discussion

### A. Applicable Legal Framework

The Fifth Amendment's Due Process Clause contains an equal protection component that prohibits the federal government from enacting or enforcing laws that invidiously discriminate between individuals or groups. U.S. Const. amend. V; *Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040, 2047 (1976). Courts apply strict scrutiny to statutes that explicitly classify on the basis of race or national origin, and rational-basis review to most other classifications. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254 (1985). But facially neutral statutes—such as § 1326—are not subject to strict scrutiny merely because they have a disproportionate effect on certain groups. *See Davis*, 426 U.S. at 242, 96 S. Ct. at 2049. Instead, a facially neutral law violates the Fifth Amendment only if it produces a disparate impact and a discriminatory purpose was a motivat-

---

[6] The defendants do not address the standard of review for these factual findings. Even if we were to review de novo the District Court's finding with respect to discriminatory intent, our conclusion would be the same. *Cf. Amador-Bonilla*, 102 F.4th at 1114 n.5.

22-13038                Opinion of the Court                9

ing factor for its enactment. *Arlington Heights*, 429 U.S. at 265–66, 97 S. Ct. at 563.

The parties disagree about whether *Arlington Heights* applies here. The Government maintains that immigration laws enacted under Congress's plenary power over immigration are subject only to rational-basis review. *See, e.g.*, *Matthews v. Diaz*, 426 U.S. 67, 81–82, 96 S. Ct. 1883, 1892 (1976) ("The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization."). The defendants respond that § 1326 is a domestic criminal statute—not a rule of admission or exclusion—and thus subject to ordinary equal protection analysis.

We need not resolve that dispute. Every circuit to address this issue has recognized that the correct standard is, at best, uncertain. *See, e.g.*, *Sanchez-Garcia*, 98 F.4th at 98 (explaining that "the correct standard of review for this challenge is not entirely clear"). But regardless of which standard applies—*Arlington Heights* or rational basis—the defendants' challenge fails. We therefore proceed, as other circuits have, under the more demanding *Arlington Heights* framework. *See, e.g.*, *id.* ("[W]e can leave for another day a definitive resolution of the standard of review question and proceed to an analysis under the familiar *Arlington Heights* framework.").

B. Arlington Heights *Analysis*

Under *Arlington Heights*, the defendants must show that § 1326(a) was enacted with a discriminatory purpose and has a disparate impact. 429 U.S. at 265–66, 97 S. Ct. at 563. We consider several factors under *Arlington Heights*:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators[;] . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives.

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (citations and internal quotation marks omitted). The defendants presented evidence to the District Court for all these factors, but the District Court was not persuaded. We find no clear error in that conclusion. We begin with the statute's history.

### 1.    The Statute's Origins and Developments

Congress first criminalized unlawful reentry in the Act of March 4, 1929, commonly referred to as the Undesirable Aliens Act of 1929 ("1929 Act"). The 1929 Act made it a crime for any previously deported noncitizen to reenter the United States without authorization. The legislative record from 1929 is sparse. Even so, the defendants contend—and the Government does not deny—that the 1929 Act emerged during an era of overtly discriminatory rhetoric and race-based immigration policy.

But the 1929 Act did not stand for long. In 1947, the Senate Judiciary Committee undertook a sweeping review of the nation's immigration laws. *See* S. Rep. No. 81-1515, at 1 (1950). It held hearings, conducted fieldwork, and consulted executive agencies. *Id.* at 2–4. That process resulted in a 925-page report that identified defects in the statutory scheme and recommended reforms. *See generally id.* Congress responded with the Immigration and Nationality Act of 1952 ("1952 Act"), a reorganization and recodification that replaced more than 200 laws and policies with a unified code. *See generally* Pub. L. No. 82-414, 66 Stat. 163 (1952).

As part of the 1952 Act, Congress repealed the 1929 Act and enacted a new unlawful reentry provision, § 1326, which expanded the reentry offense and unified the penalties. Whereas the 1929 Act had imposed varying punishments depending on the prior grounds for removal, the 1952 Act adopted a uniform scheme. It also broadened the statute's reach: a person who had unlawfully reentered could now be charged for being "found in" the United States. 8 U.S.C. § 1326(a)(2).

Notably, however, the reentry provision was not a focus of congressional debate for the 1952 Act. *See Carrillo-Lopez*, 68 F.4th at 1146 ("Congressional debates did not mention the illegal reentry provisions. . . ."). And since the 1952 Act's enactment, Congress has amended § 1326 multiple times. Among other

12                    Opinion of the Court                    22-13038

things, it has added new penalties,[7] expanded the class of prose-cutable defendants,[8] and specified when removal orders can be subject to collateral attack.[9]

### 2.    The 1929 Act's Relevance

The defendants and amici devote much of their argument to showing that the 1929 Congress acted with discriminatory intent when it criminalized unlawful reentry in the 1929 Act. They cite patently racist statements made during that era and argue that the 1929 Act was steeped in discriminatory intent. We agree that much of the 1929 Act's history is plagued with xenophobic rhetoric. Still, the statute before us is not the unlawful reentry provision in the 1929 Act; it is § 1326, enacted in 1952 and amend-ed repeatedly thereafter. That distinction is dispositive.

The defendants' theory—that the 1952 Congress reenacted the unlawful reentry provision with the same discriminatory in-tent as the 1929 Congress—rests on a misunderstanding of how legislative intent works. Laws do not carry forward "taint" through reenactment unless the later legislature acted with the same constitutionally impermissible purpose. *See Johnson v. Gover-*

---

[7] Pub. L. No. 100-690, § 7345(a), 102 Stat. 4181, 4471 (1988); Pub. L. No. 101-649, § 543(b)(3), 104 Stat. 4978, 5059 (1990); Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (1994).

[8] Pub. L. No. 104-208, §§ 305(b), 308(d)(4)J), (e)(1)(K), (14)(A), 324(a)–(b), 110 Stat. 3009, 3009-606, 3009-618 to 3009-620, 3009-629 (1996).

[9] *See* 8 U.S.C. § 1326(d); Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279 (1996).

*nor of Fla.*, 405 F.3d 1214, 1223–24 (11th Cir. 2005) (en banc); *Thompson v. Sec'y of State for Alabama*, 65 F.4th 1288, 1298 (11th Cir. 2023); *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021). "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74, 100 S. Ct. 1490, 1503 (1980).

That is why courts begin from the presumption that legislatures act in good faith. *See Miller v. Johnson*, 515 U.S. 900, 916, 115 S. Ct. 2475, 2488 (1995); *Abbott*, 585 U.S. at 603, 138 S. Ct. at 2324. This presumption stems from two foundational principles: judicial restraint and respect for the separation of powers. *Cf. Alexander v. S. Carolina State Conf. of the NAACP*, 602 U.S. 1, 11, 144 S. Ct. 1221, 1236 (2024). Courts are not designed to second-guess the motives of coordinate branches absent compelling proof. *Id*. And if the burden were reversed—if the Government had to prove a negative each time it legislated near disfavored historical terrain—Congress would face judicial oversight not of what it said or did, but of what it did not say and of motives it never voiced. *See id*. (citing *Easley v. Cromartie*, 523 U.S. 234, 241, 121 S. Ct. 1452, 1458 (2001)).

The defendants come close to urging us to adopt exactly that framework.[10] They suggest that if a law today shares some

---

[10] To be sure, the defendants concede that their proposed framework is foreclosed by Circuit precedent. But in their opening brief, they say that they "seek[] to preserve a challenge to this Court's prior holding that a 'subse-

historical resemblance to a prior one passed with animus, then it is presumptively suspect. And unless the legislature affirmatively rebuts that inference—by disclaiming past motives, disproving discriminatory intent, or producing some legislative record of virtue—the law should fall.

But that is not the law. *E.g.*, *Abbott*, 585 U.S. at 603, 138 S. Ct. at 2324 ("[T]he presumption of legislative good faith [is] not changed by a finding of past discrimination."). The burden lies with the challenger to show that the relevant legislature acted with discriminatory purpose. Courts do not, and cannot, start from an assumption of improper motive. To say otherwise would turn *Arlington Heights* on its head.

Nor would such a regime be feasible in practice. As the Supreme Court has explained, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384, 88 S. Ct. 1673, 1683 (1968); *accord League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 939 (11th Cir. 2023) ("[A] statement or inquiry by a single legislator would constitute little evidence of discriminatory intent on the part of the legislature.").

---

quent legislative re-enactment can eliminate the taint from a law that was originally enacted with discriminatory intent.'" (quoting *Johnson*, 405 F.3d at 1223). Even setting aside our prior panel precedent rule, *see Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) ("The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision." (citation omitted)), we reject the argument for the reasons set forth in today's decision.

Discerning collective legislative intent is hard enough in ordinary cases. *See League of Women Voters*, 66 F.4th at 925 ("[D]ifficulty is to be expected when examining the subjective intent of a multi-member body."). The task would become nearly impossible if courts were told to presume bad motives based on the acts of a different legislature decades earlier.

And there is a more basic structural problem. A burden-shifting regime of this kind would collide head-on with the doctrine of legislative immunity. *Cf. United States v. Brewster*, 408 U.S. 501, 526, 92 S. Ct. 2531, 2544 (1972). If challengers could rely on historical echoes to shift the burden to the Government, then the only practical way for the Government to respond would be to call legislators to the stand—to ask what they knew, why they voted, and whether they harbored any impermissible intent.[11] But the Speech or Debate Clause forbids that.[12] U.S. Const. art. I, § 6,

---

[11] And in a case like this one, where the law being challenged was enacted in 1952, most of the legislators are long deceased. If silence or ambiguity could shift the burden to the Government, then it would be impossible to satisfy. There would be no living witnesses to question, no record to consult, and no means for the government to carry a burden it never shouldered in the first place.

[12] The legislative privilege serves to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502, 95 S. Ct. 1813, 1821 (1975) (quoting *Gravel v. United States*, 408 U.S. 606, 617, 92 S. Ct. 2614, 2623 (1972) (internal quotation marks omitted)). As a result, courts cannot compel lawmakers to explain their motives or defend their votes. *See Brewster*, 408 U.S. at 525, 92 S. Ct. at 2544. And without that testimony, the Government would not be able to meet the burden that the defendants' regime would impose.

cl. 1 (providing that "for any Speech or Debate in either House," "Senators and Representatives . . . shall not be questioned in any other Place"); *see also Brewster*, 408 U.S. at 525, 92 S. Ct. at 2544 ("It is beyond doubt that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts").

### 3.    Evaluating the Legislative Intent in 1952

The upshot is that "[t]he strong 'presumption of good faith' on the part of the 1952 Congress is central to our analysis." *Carrillo-Lopez*, 68 F.4th at 1153 (citation omitted). The defendants point to the broader context in which the 1952 Act was passed to try to overcome that presumption. They have not carried their burden.

In the defendants' view, Congress reenacted the unlawful reentry provision against a backdrop of racially charged discourse and materials, and it did so without grappling with the discriminatory origins of the 1929 Act. But the totality of that evidence—statements by legislators and executive officials, reuse of statutory language, President Truman's veto, and disparate impact—fails to establish that the 1952 Congress acted with a discriminatory purpose.[13] That is the relevant inquiry.

#### i. Codification and Context

---

[13] We have reviewed the seven amicus briefs and the parties' submissions, which examine the 1952 Act's history in detail. We do not respond to every historical citation, but we have considered them all.

22-13038               Opinion of the Court                    17

To start, Congress's reuse of statutory language from 1929 tells us little—if anything—about its purposes in 1952. *Accord Amador-Bonilla*, 102 F.4th at 1117 ("That the 1952 Congress adopted the 1929 Act's language does not mean it also adopted any discriminatory intentions of the 1929 Congress."). Here, Congress was engaged in a broad codification project—one that spanned years of committee study and generated a nearly thousand-page report. The reentry provision was not the focus of floor debates and drew little if any attention in the legislative record. The notion that Congress quietly smuggled in a discriminatory motive through its reenactment of unremarked-upon text strains credulity.

Nor does the historical context support the idea that Congress harbored a hidden racial motive. The 1952 Act was passed at the height of McCarthyism, and much of the legislative focus was about excluding Communists and other perceived enemies of the United States. *See* Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 237 (2004);[14] *see also* 98 Cong.

---

[14] In a case like this, we would ordinarily expect an expert to consult the legislative record underlying the statute. But here, Professor Benjamin Gonzalez O'Brien, one of the defendants' experts, acknowledged that he did not review the 925-page Committee report that led to the 1952 Act. His analysis relied heavily on secondary sources, including Mae Ngai's book. Yet even Ngai notes how, following World War II, members of the Senate Judiciary Committee that drafted that report were mainly concerned with the threat of Communism. Ngai, *Impossible Subjects*, at 236–37. Ngai describes the chair of that committee, Senator Pat McCarran, as a "dedicated anti-Communist and Cold War warrior" who "saw revision of the nation's immigration laws

Rec. 5169 (1952) (finding that "totalitarian ideologies hostile to the United States taking a more and more firm hold on the minds of hundreds of millions of people" was a consideration in the 1952 Act). An entire chapter of the Senate Judiciary Committee's report, entitled "Communism as an Alien Force," elaborated on how a revision of the nation's immigration laws was essential to combatting the Communists' "systematic infiltration" of the United States. S. Rep. No. 81-1515, at 781 (1950). Plainly, the 1952 Congress's immigration concerns were different from those of the 1929 Congress.

What's more is that Congress has revisited and amended § 1326 repeatedly. Each time, it expanded the statute's reach, increased penalties, or modified provisions in accordance with changing law. The defendants do not seriously argue that those reenactments were racially motivated, nor do they identify anything in the record suggesting as much. In the end, "[t]he further removed that § 1326 becomes from [the 1929 Act] by amendment, the less it retains its odor." *Barcenas-Rumualdo*, 53 F.4th at 866.

### ii. Statements by Public Officials

The contemporaneous statements the defendants cite to show that the 1952 Congress harbored discriminatory intent fare no better. The defendants identify a handful of statements—some

as a tool in the United States' urgent battle against Communism." *Id.* at 237. Senator McCarran and the committee recognized "the need 'to bring our immigration system into line with the realities of Communist tactics." *Id.* (citation omitted).

from legislators, others from executive officials—reflecting offensive or racialized views. For example, the defendants point to multiple uses of the slur "wetback" surrounding the 1952 Act, including by Attorney General Peyton Ford and Pennsylvania Representative Francis Walter. *E.g.*, 98 Cong. Rec. 4403 (1952). But, no matter how reprehensible, isolated comments do not dictate congressional purpose. *See O'Brien*, 391 U.S. at 384, 88 S. Ct. at 1683.

That Congress enacted the 1952 Act over President Truman's veto does not help the defendants either. President Truman's objections centered on the national origins quota system—not the reentry provision. *See Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality*, 1 Pub. Papers 441–45 (June 25, 1952). He did not mention § 1326 or anything like it. *Accord Carrillo-Lopez*, 68 F.4th at 1148 ("President Truman's opposition to the national-origin quota system, the central reason for his veto, sheds no light on whether Congress had an invidious intent to discriminate against Mexicans and other Central and South Americans in enacting § 1326."). Even if he had, his views could not control the meaning or motive of the legislation: "The fears and doubts of the opposition are no authoritative guide to the construction of legislation." *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394, 71 S. Ct. 745, 750 (1951).

### iii. Statistical Disparities

Finally, the defendants invoke disparate impact. They insist that § 1326 prosecutions disproportionately involve individuals from Mexico and other Latin American countries. But the defendants

offer no evidence about what proportion of noncitizens subject to prosecutions under § 1326 were Mexican or Latino rather than any other group. Without that basic data, any meaningful statistical comparison is impossible.[15] And without that statistical comparison, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 34, 140 S. Ct. 1891, 1916 (2020). Regardless, even if the defendants did offer this necessary comparison, the Supreme Court has been clear that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact."[16] *Arlington Heights*, 429 U.S. at 264–65, 97 S. Ct. at 563.

## IV. Conclusion

The District Court did not clearly err in finding that the defendants have not shown that § 1326 was enacted or maintained

---

[15] In other words, the "foreseeability of the disparate impact" and "knowledge of that impact" considerations under *Arlington Heights* do not weigh in favor of the defendants because they have not shown a disparate impact.

[16] In any event, the disparity the defendants identify is easily explained by geography: the United States shares a nearly 2,000-mile land border with Mexico. It is no surprise that most prosecutions for unlawful reentry involve nationals from a country that abuts that border. As one court put it, "it is common sense that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so." *Carrillo-Lopez*, 68 F.4th at 1153 (cleaned up) (citation and internal quotation marks omitted).

for a discriminatory purpose. We join every circuit to have considered this issue in upholding the statute's constitutionality.

The judgments of the District Court are **AFFIRMED**.

JORDAN, Circuit Judge, Concurring:

After considering the parties' evidentiary submissions, the district court found that that the 1952 Congress did not enact 8 U.S.C. § 1326 with an unconstitutional discriminatory motive. I would affirm on the narrow ground that this finding was not clearly erroneous. Because the majority seems to conduct *de novo* review, I concur only in the judgment.[1]

## I

As a general matter, a determination about whether a law was enacted with discriminatory motive is a factual finding subject to clear error review. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021) ("We also granted certiorari to review whether the Court of Appeals erred in concluding that HB 2023 was enacted with a discriminatory purpose. The District Court found that it was not, and appellate review of that conclusion is for clear error[.]") (citation omitted); *Hunter v. Underwood*, 471 U.S. 222, 229–30 (1985) (agreeing with the Eleventh Circuit's application of the clear error standard in overturning a district court's finding that an Alabama constitutional provision was not enacted with a racially discriminatory motive). The defendants neither acknowledge, nor discuss, the clear error standard in their brief.

---

[1] The majority twice says that the district court did not commit clear error. Despite these statements, it seems to me that the majority's discussion consists of a plenary review of the evidence.

*See* Br. of Appellants at 21 (asserting that review is *de novo* because a constitutional question is presented).

The district court, adopting the report of the magistrate judge, found that the 1952 Congress did not enact § 1326 with discriminatory intent. Under the clear error standard, "we may not reverse just because we would have decided the [matter] differently. A finding that is plausible in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (internal quotation marks and citation omitted).

## II

I agree with the majority that the best course of action is to apply the framework set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), as supplemented by cases like *Greater Birmingham Ministries v. Secretary of State of Alabama*, 992 F.3d 1299, 1321–22 (11th Cir. 2021). *Cf. Hunter*, 471 U.S. at 227 ("Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment[.]"). Even under this framework, however, the defendants have the burden of proving discriminatory motive: "Whenever a challenger claims that a . . . law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the [government]." *Abbott v. Perez*, 585 U.S. 579, 603 (2018).

22-13038                JORDAN, J., Concurring                3

The defendants and their amici say that the following evidence they presented shows that § 1326 was enacted with discriminatory motive. First, the predecessor to § 1326 was passed with discriminatory intent in 1929. Second, the 1952 Congress did nothing to purge the taint from 1929, and in a letter to Congress Deputy Attorney General Peyton Ford used a racially derogatory term when he praised § 1326 for aiding in "taking action against the conveyors and receivers of the wetback." Third, one legislator made explicitly racist statements in support of the 1952 legislation, saying that "the western European races have made the best citizens in America." Fourth, § 1326 has a disparate impact on Mexican Americans and Latin Americans, as from 2016–2020 Hispanics constituted 97% of the persons prosecuted under the statute. Fifth, the defendants' expert witnesses opined that § 1326 was enacted with discriminatory motive. Sixth, in 1949 Congress passed a law colloquially known as the "Wetback Bill"—which authorized the importation of Mexican farm workers—and during debates on the legislation the word "wetback" was used 89 times. Seventh, President Truman's veto of the Immigration and Nationality Act was (in the defendants' view) based in part on the reinforcement of laws passed decades earlier (like the 1929 predecessor to § 1326). Eighth, a 1950 congressional report stated that the laws passed in the 1920s had not preserved the relationship "between the various elements of our white population," and showed that one of Congress' goals in passing § 1326 was (again in the defendants' view) to further white supremacy. *See, e.g.,* Br. of Appellants at 28–58; Br. of Immigration Scholars at 4–49; Br. of

4                          JORDAN, J., Concurring                         22-13038

Center of Immigration Law and Policy at 10–34; Br. for Advocates for Basic Legal Equality, et al. at 6–28; Br. of Professor S. Deborah Kang at 11–25.

Maybe this evidence, if credited, could have permitted a finding of discriminatory intent. I say maybe because the Ninth Circuit has reversed as clearly erroneous a district court's finding that § 1326 was enacted with a discriminatory motive. *See United States v. Carrillo-Lopez*, 68 F.4th 1133, 1147–54 (9th Cir. 2023). In any event, it was the province of the district court, sitting as the trier of fact, to accept or reject the defendants' evidence. *See, e.g.*, *Hawk v. Olson*, 326 U.S. 271, 279 (1945) ("This, of course, does not mean that uncontradicted evidence of a witness must be accepted as true on the hearing. Credibility is for the trier of facts."); *Burston v. Caldwell*, 506 F.2d 24, 26 (5th Cir. 1975) ("The district court, of course, was not required to accept [the witness'] testimony, even if uncontradicted."). Similarly, the court had the general freedom to decide what weight to give to the evidence presented. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1998) ("Assessing the weight of evidence and credibility of witnesses is reserved for the trier of fact.").

The problem for the defendants here is not that the district court failed to consider their evidence of discriminatory motive, but that it was not persuaded by that evidence. The district court accepted that § 1326—as applied—had a discriminatory impact, but correctly noted that such an impact was insufficient for the defendants to carry their burden of proving intentional discrimi-

22-13038               JORDAN, J., Concurring                    5

nation.  The court recognized that there was evidence that the predecessor to § 1326 was passed with discriminatory motive in 1929, and understood that this evidence was "relevant," but believed the intent of the 1929 Congress was of "limited probative value."  The court acknowledged the "troubling" language used by Deputy Attorney General Ford, but thought that it was not significantly relevant because he was not a member of Congress. The court considered the racist statements of the one legislator regarding the Immigration and Nationality Act, but explained that those statements could not be seen as evidence of the overall intent of Congress.  The court reasoned that President Truman's veto message was concerned mainly with the Immigration and Nationality Act's continued use of a quota system that disfavored immigrants from Asia and Southern and Eastern Europe, and not with the disfavored treatment of immigrants from Latin America. The court also thought that the views of President Truman, an opponent of the legislation, was not very indicative of the intent of those who voted in favor of the legislation.  *See* D.E. 78 at 4–10.

In order to prevail on appeal, the defendants have to demonstrate that the district court committed clear error, and in my view they have not done so.  The district court's finding is plausible in light of the full record.  *See Cooper*, 581 U.S. at 293. And on similar evidentiary records some of our sister circuits have upheld, on clear error review, the factual findings of district courts that § 1326 was not enacted with a discriminatory motive.  *See, e.g., United States v. Viveros-Chavez*, 114 F.4th 618, 626–30 (7th Cir. 2024); *United States v. Amador-Bonilla*, 102 F.4th 1110, 1116–19 (10th

Cir. 2004); *United States v. Sanchez-Garcia*, 98 F.4th 90, 98–102 (4th Cir. 2024).[2]

I would follow the same path here and "decide no more than what is necessary to resolve [this] . . . appeal." *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1322 (11th Cir. 2020). Deciding a case narrowly is usually the better institutional option, and we should "resist the pulls to decide the constitutional issues involved [here] on a broader basis than the record before us imperatively requires." *Street v. New York*, 394 U.S. 576, 581 (1969). *See also United States v. Whatley*, 719 F.3d 1206, 1223 (11th Cir. 2013) (Jordan, J., concurring in part and dissenting in part) ("Procrastination is not generally seen as a good character trait, but in constitutional adjudication it can often be a virtue."); Cass R. Sunstein, One Case at a Time: Judicial Minimalism on the Supreme Court 4 (1999) ("Decisional minimalism has two attractive features. First, it is likely to reduce the burdens of judicial decision. . . . Second, and more fundamentally, minimalism is likely to make judicial errors less frequent and (above all) less damaging.").

### III

I concur in the judgment affirming the decision of the district court.

---

[2] The Tenth Circuit indicated in *Amador-Bonilla*, 102 F.4th at 1114 n.5, that it would have reached the same result under de novo review.